## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**DANIEL C. ANDERSON,**
       **Plaintiff,**

**v.**                                 **Case No: 3:11cv173/WS/MD**

**MICHAEL J. ASTRUE**
**Commissioner of Social Security,**
          **Defendant.**

_____

### REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant Anderson's application for disability insurance benefits and Supplemental Security Income benefits under Titles II and XVI of the Act.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## PROCEDURAL HISTORY

On October 2, 2007, Plaintiff, Daniel C. Anderson ("Mr. Anderson"), filed applications for benefits claiming an onset of disability as of August 14, 2005 (tr. 104-105, 202-206, 212-219).   The applications were denied initially and on reconsideration, and Mr. Anderson requested a hearing before an administrative law judge ("ALJ") (tr. 106-117).   A hearing was held on October 2, 2009 at which Mr. Anderson was represented by counsel and testified (tr. 68-103).   A vocational expert also testified.  *Id*.  On January 13, 2010, the ALJ entered an unfavorable decision (tr. 52-67), which due to a clerical error was later rescinded (tr. 171-172).  On June 15, 2010, the ALJ held a supplemental hearing (tr. 30-51).   Mr. Anderson and his girlfriend testified.  *Id*.  Another vocational expert also testified.  *Id*.  The ALJ issued another unfavorable decision on July 23, 2010 (tr. 11-29).  Mr. Anderson requested review by the Appeals Council submitting as additional evidence a "Representative Brief" dated January 4, 2011 (tr. 4-10, 298-299).  The Appeals Council declined review on February 8, 2011 (tr. 1-3).  The Commissioner has therefore made a final decision, and the matter is subject to review by this court.  *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1262 (11th Cir. 2007); *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998).  This timely appeal followed (doc. 1).

## FINDINGS OF THE ALJ

Relative to the issues raised on this appeal, the ALJ found that Mr. Anderson meets the insured status requirements of the Act; that he had not engaged in substantial gainful activity since his claimed onset date; that he had severe impairments of right healed clavicle fracture with nerve injury, status post open femur fracture and IM rodding, right traumatic leg injury with below the knee amputation, and status post right forearm fracture, but that he did not have an impairment or combination of impairments that met or equaled one of the

impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; that he had the residual functional capacity to perform the full range of sedentary work defined in 20 C.F.R. 20 404.1567(a) in that he can lift ten pounds and stand/walk for two hours (altering his position at 2-hour intervals) while being restricted to the performance of simple, routine and repetitive tasks; that he was not capable of performing any past relevant work as a production assembler and solderer, but that there are jobs that exist in significant numbers in the national economy that he can perform such as call out operator, bonder semiconductor and space scheduler; and that he has not been under a disability as defined in the Act from claimed onset date through the date of the ALJ's decision (tr. 16-24).

## STANDARD OF REVIEW

In Social Security appeals, this court must review de novo the legal principles upon which the Commissioner's decision is based.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)).  There is no presumption that the Commissioner followed the appropriate legal standards in deciding a claim for benefits, or that the legal conclusions reached were valid.  *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002).  Failure to either apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal.  *Ingram*, 496 F.3d at 1260.

The court must also determine whether the ALJ's decision is supported by substantial evidence.  *Moore*, 405 F.3d at 1211 (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004)).  Even if the proof preponderates against the Commissioner's decision, if supported by substantial evidence, it must be affirmed.  *Ingram*, 496 F.3d at 1260; *Miles*, 84 F.3d at 1400.  Substantial evidence is more than a scintilla but less than a preponderance, and encompasses such

relevant evidence as a reasonable person would accept as adequate to support a conclusion. *Moore*, 405 F.3d at 1211 (citation omitted). In determining whether substantial evidence exists, the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Secretary's decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence. *Moore*, 405 F.3d at 1211 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). Findings of fact of the Commissioner that are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g); *Ingram*, 496 F.3d at 1260.

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The social security regulations establish a five-step evaluation process to analyze claims for both SSI and disability insurance benefits. *See Moore,* 405 F.3d at 1211; 20 C.F.R. § 416.920 (2009) (five-step determination for SSI); 20 C.F.R. § 404.1520 (2009) (five-step determination for DIB). A finding of disability or no disability at any step renders further evaluation unnecessary. *See* 20 C.F.R. § 416.920; 20 C.F.R. § 404.1520. The steps are:

1.   Is the individual currently engaged in substantial gainful activity?

2.   Does the individual have any severe physical or mental impairment that meets the duration requirement?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 to subpart P of 20 C.F.R. Part 404 and meet the duration requirement?

4.      Considering the individual's residual functional capacity, can the individual perform past relevant work?

5.      Can the individual perform other work given the individual's residual functional capacity, age, education and work experience?

*Id*.

These regulations place a very heavy burden on the claimant to demonstrate both a qualifying impairment or disability and an inability to perform past relevant work. *Moore*, 405 F.3d at 1211 (citing *Spencer v. Heckler*, 765 F.2d 1090, 1093 (11th Cir.1985)).  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step 5 to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Allen v. Bowen,* 816 F.2d 600, 601 (11th Cir. 1987).  If the Commissioner carries this burden, claimant must prove that she cannot perform the work suggested by the Commissioner.  *Doughty,* 245 F.3d at 1278 n.2; *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

## PLAINTIFF'S MEDICAL HISTORY

In 1988 Mr. Anderson had a very serious motor vehicle accident, which resulted in the amputation of his right leg below the knee, traumatic brain injury, comminuted fractures of the mid radius and ulna with metallic plates and screws in place (right forearm), colostomy, fractures of both inferior pubic rami, diastasis of left sacroiliac joint, pelvic fracture with extensive perineal laceration, right femur fracture, and scalp laceration (tr. 435-550).  He was treated at the Yale New Haven Hospital from March 11, 1988 to November 1, 1988.  *Id*.

On December 17, 2001, Mr. Anderson obtained a prescription from Dr. Collins at Gaylord Hospital, Inc. in Connecticut for a modification of his right leg prosthesis

(tr. 301).   Mr. Anderson then treated with Dr. Kemal at the Hanger Prosthetics & Orthotics, Inc. ("Hanger") in New London, Connecticut from December 21, 2001 to July 26, 2002  for evaluation of existing right below knee prosthesis (tr. 303-314).  On the December 21, 2001 visit the doctor noted:

> an open area on the posterior popliteal aspect of his limb. . .this has been a long-standing problem in which [Mr. Anderson] has flare ups and incidences where he cannot wear his prosthesis due to the area swelling up.  It is quite apparent [Mr. Anderson] has developed a continuous, infected bursa that fills with puss and then drains, causing pain and discomfort.

Tr. 314.  The doctor discussed the importance of hygiene and of wearing a shrinker at night, and recommended Mr. Anderson "be in touch with a plastic or orthopedic surgeon in an effort to have this bursa excised and reduce the possibility of it flaring up again.  *Id*.

On March 29, 2002, Mr. Anderson returned to Hanger and was "fit with a replacement silicone suction socket" to provide him the proper fit, function and comfort to allow him to continue with his activities of daily living (tr. 310-313).  He then received a prescription for a new prosthesis on May 8, 2002 from Dr. Kemal at Hanger (tr. 302).  Mr. Anderson had various appointments in order to get fitted for the new prosthesis (tr. 303-309).  On May 13, 2002, the doctor's notes mention that Mr. Anderson underwent several tests and MRI's, but that it was determined that his condition was chronic and the surgeons decided that he would not benefit from surgery (tr. 309).  On July 12, 2002, he received the new prosthesis, and reported being pleased with its fit and comfort (tr. 307).  He went back on July 26, 2002, so that Dr. Kemal could modify the prosthesis slightly in order  to provide him comfort (tr. 303).  All of this treatment occurred prior to the claimed onset of disability.

On July 29, 2005, Mr. Anderson was involved in a motorcycle accident where he sustained fractures to his right clavicle and right scapula (tr. 315-331).  He was treated at the Yale New Haven Hospital where he had CT scans of his chest, thoracic and lumbar spines with and without contrast, which showed no injuries to his chest

or back (tr. 315-316).  He also had x-rays to of his right shoulder and left tibia, which showed the fractures of his right clavicle but no injury to his left tibia (tr. 320-321). He underwent a CT scan of his brain and cervical spine without contrast, which presented "[n]o evidence of an acute traumatic injury to the brain or cervical spine" (tr. 322-323).  He had x-rays of his pelvis, which showed "[n]o acute osseus injury" (tr. 324).  Lastly, he had blood work done, which tested positive for alcohol (tr. 325-331).  This treatment also occurred prior to the claimed onset of disability.

Mr. Anderson treated with Dr. Chaudhry at the New England Retina Associates from March 15, 2004 (prior to claimed onset disability) to September 2, 2005 (tr. 340-346).  Mr. Anderson was referred to Dr. Chaudhry on an emergency basis due to a rhegmatogenous retinal detachment in his right eye (tr. 346).  On March 18, 2004, Mr. Anderson underwent surgery to repair the retina without complications (tr. 344-345). Mr. Anderson went several more times to see Dr. Chaudhry, who reported good progress (tr. 341-343).  On his February 17, 2005 notes, Dr. Chaudhry stated that Mr. Anderson's vision with correction was 20/40 OD and 20/25 OS (tr. 341).   Dr. Chaudhry then referred Mr. Anderson back to Dr. Parker[1] at the Thames Eye Group, P.C. for eye pressure checks, and he was treated there from February 25, 2005 (prior to claimed onset disability) to September 2, 2005 (tr. 332-339).

Mr. Anderson returned to Yale New Haven Hospital to treat at its Orthopaedic Hand Clinic from August 3, 2005 (prior to claimed onset disability) to November 21, 2005 (tr. 347-358).  On August 24, 2005, he had cervical spine x-rays, which showed "minimal neurocentral lipping of C5/C6 on the right. . . with a questionable area of erosion at the exit foramina[, but t]he vertebral body heights and disc spaces [we]re relatively preserved [and n]o other significant abnormalities [we]re seen."  Tr. 355. That same day, the doctor noted that Mr. Anderson had a partial amputation of his right middle finger four weeks earlier, but had no complaints (tr. 353).  On September

---

[1]Dr. Chaudry's notes mention that Dr. Parker referred Mr. Anderson to him, but no medical records were submitted of that prior treatment with Dr. Parker.

21, 2005, Mr. Anderson had x-rays of his clavicles, which showed "[m]inimal interval healing of the right clavicle fracture."  Tr. 352.  On his last visit of November 21, 2005, Mr. Anderson underwent an evaluation of right shoulder weakness or neuropathy by having an EMG/NCV, which showed electrodiagnostic evidence of severe right axillary neuropathy, severe right proximal radial neuropathy, mild-to-moderate bilateral median neuropathy at the wrists (CTS), and bilateral ulnar neuropathies across the elbows (tr. 347).

On August 8, 2007, Mr. Anderson was brought to the emergency room of Gulf Breeze Hospital in handcuffs by a Santa Rosa Sheriff's Officer because he was struck with a fist and had a laceration to his lip that required sutures (tr. 364-368). He was treated and released.  *Id*.  He returned on August 19, 2007 to have the sutures removed (tr. 359-363).  The records show that Mr. Anderson was working full-time at Servpro and living locally (tr. 359-368).

After filing his application for benefits, Mr. Anderson was evaluated by Dr. Henry Boilini, Internal Medicine, on December 8, 2007 (tr. 369-373).  In Dr. Boilini's Consultative Examination Report he reported Mr. Anderson's past medical history of a 1988 motor vehicle accident that resulted in severe injuries, a four month hospitalization including two months in a coma (tr. 369).  These severe past injuries were "a below the knee amputation on the right leg, a broken right femur, abdominal injury requiring a colonotomy for one year, traumatic brain injuries, and right arm fracture." *Id*.  Dr. Boilini also mentioned Mr. Anderson's retinal detachment and loss of the tip of his right third finger (tr. 370).  Dr. Boilini noted that Mr. Anderson was alleging disability due to right leg amputation (tr. 369).  Mr. Anderson's primary complaint was his "chronic right leg pain secondary to his prosthesis" and also "poor reliability at work due to his poor concentration and memory." *Id*.

Dr. Boilini conducted a physical examination of Mr. Anderson and found him well-dressed, well-nourished, and in no acute distress (tr. 371).  Mr. Anderson ambulated steadily with slight difficulty having to favor his right leg, but did not use

assistive devices.  *Id*.  Dr. Boilini examined Mr. Anderson's areas of amputation (right leg and right middle finger) and "[t]he skin was intact and in good condition at both amputation sites."  *Id*.  "There was significant tenderness to palpation at the amputation site of the right knee" but there were "no signs of erythema, swelling or infection at the site."  *Id*.  In a vision test with his glasses, Mr. Anderson had 20/70 in right eye and 20/40 in the left one.  *Id*.  The grip strength test for both arms was 5/5.  *Id*.  As to their range of motion, the right shoulder abduction was only to 90 degrees, but forward and backward elevation as well as internal and external rotations were normal.  *Id*.  Aside from the aforementioned, Dr. Boilini's impression was that Mr. Anderson's "main limitation from the amputation is the tenderness at the prosthesis site."  Tr. 372.

As to Mr. Anderson's functional status, Dr. Boilini stated that Mr. Anderson could dress and feed himself, stand for 20 minutes before the pain in his right leg became severe, walk for 50 yards before the pain is severe, sit for long periods of time but requiring readjusting of his leg, lift 100 pounds without problems, and help around his house with sweeping, mopping, vacuuming, cooking and shopping.  *Id*. Mr. Anderson was not taking any medications at the time (tr. 370).

On May 8, 2008, Mr. Anderson went for a routine eye exam at Navarre Family Eye Care (tr. 391-392).  He also treated with Dr. Andrew Kortz for glaucoma from April 30, 2008 to April 28, 2009 (tr. 393-394, 422-434).

Mr. Anderson treated at the Good Samaritan Health Clinic from April 29, 2008 to November 25, 2008 (tr. 411-421).  His main complaints were right shoulder and right knee pain.  Id.  Most notes state the right stump looked good, but that his prosthesis was worn out and too loose.  *Id*.  There were several medications listed: paxil, timolol, lumigan, lexapro, and timoptic, which treat depression and glaucoma. *Id*.

On June 10, 2008, Mr. Anderson was referred by the Good Samaritan Health Clinic for x-rays of his right shoulder and right knee (tr. 398).  Mr. Anderson went on

June 12, 2008 to Gulf Breeze Hospital for the diagnostic tests, and the radiology report stated:

> **Right shoulder three views: Degenerative arthrosis of the glenohumeral and AC joint.  Healed fracture distal 1/3 right clavicle.  No findings of dislocation or acute post-traumatic findings.**
>
> **Right knee two views: Below-the-knee amputation.  No soft tissue gas calcification.   No findings of osteomyelitis.   Distal femoral nail is unremarkable.  The distal femur is intact.  No obvious joint effusion.**

Tr. 396-401.

Mr. Anderson was referred to Dr. Susan A. Danahy, who conducted a psychological evaluation on June 26, 2008 (tr. 402-410).   The Consultative Examination Report detailed that Mr. Anderson walked the steps to her office without complaint, had a somewhat flat affect, and his chief complaint was "I can't remember things; I forget where I'm going or where I am and I can't figure out the day of the week."  *Id*.  Mr. Anderson gave as an example having a great deal of difficulty remembering appointments.  *Id*.  He also complained of constant pain in his amputated leg and being unable walk far or stand for long.  *Id*.  He, however, admitted to not taking any medication for pain.  *Id*.

During the mental status evaluation, Dr. Danahy concluded that his memory "seemed reasonably good."  *Id*.  He exhibited neuropsychological problems, and had difficulty concentrating on directions, which had to be repeated to him.  Id.  He was patient and persistent throughout the testing.  *Id*.  His ability to form rapport was normal, insight and judgment were grossly intact, but he had specific difficulty with short-term memory.  *Id*.

As to his occupational background, Dr. Danahy noted that Mr. Anderson "actually did more skilled labor after his wreck than before."  *Id*.  He stated that his major impediment to work is his memory, but admitted "that he could be successful if he did the same thing 'over and over.'"  *Id*.  He does not think he could do the same kind of job as before because he is having more pain in his leg.  *Id*.  In regards to his

activities of daily living, Mr. Anderson can cook, clean, and go out with his friends to community activities.  *Id*.

Mr. Anderson tested in the low average range of intelligence with a Verbal IQ of 90, Performance IQ of 86, and Full-Scale IQ of 88, which places him in the 21st percentile level.  *Id*.  The testing also "took about twice as long as average to complete" and that "psychomotor tempo would be a problem in many job settings." *Id*.  Nevertheless, Dr. Danahy concluded that:

> Mr. Anderson would have a variety of occupational options, including positions requiring skilled and semi-skilled work [and h]is only limitations would be for anything requiring good abstraction ability or good academic skills.

*Id*.

Mr. Anderson underwent an orthopaedic evaluation on November 5, 2009 by Dr. Leo Chen, Orthopaedic Surgeon (tr. 551-563).  Dr. Chen took x-rays of his right shoulder, right knee and right forearm.  *Id*.  Dr. Chen listed Mr. Anderson's injuries and surgeries from the 1988 motor vehicle accident (open femur fracture, right lower extremity injury that necessitated right below knee amputation, right forearm fracture, bowel injuries requiring colostomy, closed head injuries) and the more recent motorcycle accident (right clavicle fracture and right middle finger traumatic amputation).  *Id*.  Dr. Chen confirmed the injuries with the x-rays taken.  *Id*.

Mr. Anderson's chief complaint to Dr. Chen was "[r]ight hip and leg pain, right shoulder pain and weakness, and right arm pain."  *Id*.  Dr. Chen noted that Mr. Anderson used a crutch to ambulate.  *Id*.  Mr. Anderson's prosthesis has been broken for some time and it is taped to hold it in place.  *Id*.  Mr. Anderson explained the occasional break down of his stump, including intermittent tenderness and infection, but Dr. Chen noted that it was not at that moment.  *Id*.  As to Mr. Anderson's right arm injury, Dr. Chen noted that his EMG showed severe right axillary nerve neuropraxia.  *Id*.  Mr. Anderson denied taking any medications.  *Id*.

During the physical examination, Dr. Chen found Mr. Anderson a well developed and well nourished male in no acute distress.  *Id*.  Mr. Anderson has full range of motion of his neck, back, left upper and lower extremities, right upper

extremity, and right knee. *Id*. His right shoulder showed "some numbness over his axillary distribution on the right lateral shoulder area,. . .atrophy of his deltoid and some atrophy of his supraspinatus and infraspinatus fossa posteriorly." *Id*. Thus, Dr. Chen determined that his active range of motion was 80 degrees in forward flexion and 70 degrees in abduction. *Id*. Despite the right middle finger partial amputation, Mr. Anderson has full range of motion with grip strength of 4/5 in his right hand; the left hand has 5/5 grip strength. *Id*. Mr. Anderson is "able to perform fine manipulation with his hands," including removing his prosthesis, use of crutches, and button/unbutton his shirt. *Id*. As to his right stump, Dr. Chen noted some tenderness in the posterior medial aspect, but no gross skin break down or signs of inflammation, discoloration or deformity. *Id*. Dr. Chen described it as "benign." *Id*. Mr. Anderson also had pain with deep palpation around his right proximal thigh. Id. Mr. Anderson's "gait is antalgic on the right . . . with a significant limp favoring the right leg." *Id*.

Dr. Chen concluded that Mr. Anderson "would have no mental or environmental work related restrictions," but "his ability to perform physical activity would be significantly limited by his multiple orthopaedic injuries, especially his right [below the knee amputation] and his right shoulder pain and weakness due to the axillary nerve palsy." *Id*. Dr. Chen delineated Mr. Anderson's physical abilities and restrictions in a capacity form. *Id*. Mr. Anderson can only lift and carry up to 10 pounds occasionally; he can sit 30 minutes, stand/walk for 10 minutes without interruption; he can sit a total of 6 hours in an 8 work day, stand and walk for 1 hour total in an 8 hour work day; he has full use of his left hand; with his right hand he can never reach overhead, can reach otherwise occasionally, and can handle, finger, feel, push/pull frequently; he can operate foot controls with left foot continuously; he can occasionally climb stairs and ramps, balance, stopp, kneel and crouch, but can never climb ladders/scaffolds or crawl; he can tolerate exposure to humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold, extreme heat,

vibrations, and very loud noise on a continuous basis, can frequently tolerate unprotected heights, occasionally tolerate moving mechanical parts, but can never operate a motor vehicle[2]; as to activities Mr. Anderson can: shop; travel without a companion; ambulate without using a wheelchair, walker, 2 canes or 2 crutches; use standard public transportation; prepare a simple meal and feed himself; care for his personal hygiene; and sort, handle or use paper/files; he cannot walk a block at a reasonable pace on rough or uneven surfaces or climb a few steps at a reasonable pace with the use of a single hand rail. *Id.* Dr. Chen concluded that the above limitations have lasted or will last for 12 consecutive months. *Id.*

## DISCUSSION

Mr. Anderson contends that the ALJ erred in failing to identify all of his severe impairments, that the ALJ's residual functional capacity determination is not based on substantial competent evidence, and that the ALJ's credibility finding is not based on substantial competent evidence (doc. 8, pp. 15- 24). The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained (doc. 9, pp. 5-9). The issue thus presented is whether the ALJ's decision that Mr. Anderson was not disabled, in light of his physical and mental condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.

### 1.    Failure to identify all severe impairments

Mr. Anderson argues that the ALJ's failure to list his traumatic brain injury in his list of severe impairments in step 3 of her analysis (tr. 16) means she neglected to analyze it in her assessment of his disability and determination of his ability to work (doc. 8, p. 15). However, as pointed out by the Commissioner, Mr. Anderson

---

[2]This limitation is suspect since Mr. Anderson throughout his interviews, medical records, and sworn testimony before the ALJ admitted driving on a regular basis.

concedes that the ALJ discussed at length Dr. Danahy's assessment of his mental capacity and impairments (tr. 17).  The ALJ also mentioned it when discussing Dr. Boilini's evaluation: "poor reliability due to poor concentration and memory" (tr. 16). In the step 5 analysis, the ALJ again discussed Dr. Danahy's diagnosis of "amnestic disorder possibly secondary to a closed head injury in 1988."  Tr. 21.  The ALJ, however, reasonably focused on Dr. Danahy's conclusion that Mr. Anderson could occupy a variety of skilled and semi-skilled positions in which he performed simple, routine and repetitive tasks[3].  *Id*.  Thus, Mr. Anderson's argument that the ALJ ignored his traumatic brain injury in her assessment in steps 3 and 5 of the analysis is without merit.

    2.    <u>ALJ's Residual Functional Capacity Determination</u>

Mr. Anderson alleges that the ALJ's residual functional capacity determination is not supported by substantial competent evidence because the ALJ failed to address certain medical opinions (doc. 8, p. 17)

"Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir.1998); *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010).  The ALJ discussed thoroughly Dr. Chen's orthopaedic evaluation and placed determinative weight to his opinion (tr. 20-22).  The ALJ supported her reasoning with the objective record evidence because no treating or consultative physician opined that Mr. Anderson was disabled; for example, the sporadic notes by the Good Samaritan Health Clinic.  *Id.*  As discussed above, the ALJ also took into account Dr. Danahy's psychological evaluation and her conclusions that from a mental standpoint Mr. Anderson can perform simple, routine and repetitive tasks.  *Id.*  The ALJ also cited Dr. Boilini's evaluation.  *Id.*  From a review of the record, the ALJ analyzed it as a

---

[3]Mr. Anderson admitted to Dr. Danahy "that he could be successful if he did the same thing 'over and over.'" Tr. 405.

whole and relied on the most thorough and recent evaluations of Mr. Anderson in support of her determination of his residual functional capacity.  All of the medical records or conditions that Mr. Anderson contends were not addressed were included in the numerous evaluations that the ALJ cited in her opinion.  Therefore, this argument is also unavailing.  The ALJ supported her residual functional capacity with substantial competent evidence as required, and as such her decision is conclusive.

### 3.    ALJ's credibility finding

Mr. Anderson argues that the ALJ failed to follow this Circuit's three-part pain standard when she discredited his subjective pain complaints (doc. 8, p. 18).  The ALJ found that Mr. Anderson's impairments could cause the alleged symptoms, but did not find credible Mr. Anderson's claims as to the symptoms' intensity, persistence and limiting effects because they were inconsistent with her residual functional capacity assessment (tr. 20).  The ALJ noted that Mr. Anderson did not use any assistive devices such as cane or crutches when he attended the hearing before her.  *Id.*

The ALJ explained that she considered all of the documentation and Mr. Anderson's testimony, as well as his parents' statements, that he had to stay off his leg, but reasoned that this limitation is consistent performing sedentary work.  *Id.* Moreover, the ALJ explained that Mr. Anderson's admissions that he is not under medical treatment or taking any pain medications supported her conclusion as to his lack of credibility regarding his pain complaints (tr. 20-21).  In fact, Mr. Anderson admits that he "has not had a treating doctor. . .specifically state the limitations caused by his pain."   Doc. 8 at 19.   "Nothing in the record suggest that [Mr. Anderson's] impairments have been incapable of being alleviated or controlled with the proper and regular use of prescription medications. . . ."  Tr. 21.  There is also

nothing in the record to support any allegation that Mr. Anderson had problems with side effects of medication, when taken.  *Id.*

Mr. Anderson is able to drive regularly, clean his house, prepare his meals, and go shopping.  This also underscores his pain claims as noted by the ALJ.  Mr. Anderson's lack of consistent treatment, and its complete lack thereof after 2008, confirms the ALJ's conclusion that his pain is not to a disabling degree.  Contrary to Mr. Anderon's argument, this discussion was sufficient to explain why the ALJ found his pain complaints to be less than credible.

Accordingly, it is respectfully RECOMMENDED that the decision of the Commissioner be AFFIRMED, that this action be DISMISSED and that the clerk be directed to close the file.

At Pensacola, Florida this 23rd day of April, 2012.

/s/ *Miles Davis*
**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**Any objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir. 1988).**